## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **OLUMUYIWA BALOGUN,** individually as wife of Decedent, as mother of their minor daughter **O.A.A.**, and as Personal Representative of the Estate of **ADEBOLA PIUS ADESANMI**; | **No. _____** <br><br> **Complaint for Wrongful Death & Personal Injuries** <br><br> **Jury Demanded** |
| **MILKA YIMAM**, individually as mother of Decedent and as Personal Representative of the Estate of **SIDRAK GETACHEW**, and **HELENA YONATAN ZERIHUN** as Guardian on behalf of **ZERIHUN HAILEMARIAM** individually as father of decedent. | |
| Plaintiffs, | |
| vs. | |
| **The Boeing Company,** a corporation, | |
| Defendant. | |

## COMPLAINT

Come now plaintiffs, through their lawyers at ***HERRMANN LAW GROUP,*** to allege the following complaint against defendant *The Boeing Company* (Boeing).

### I. NATURE OF ACTION

1.     Plaintiffs seek to recover damages for personal injuries and wrongful death of plaintiffs' decedents while passengers onboard Ethiopian Airlines flight ET302 that crashed near Ejere, Ethiopia just moments after takeoff from the airport at Addis Ababa, Ethiopia on March 10, 2019.

1

## II. JURISDICTION & VENUE

2. Plaintiffs *Olumuyiwa Balogun* and her minor daughter *O.A.A.* are citizens and residents of Canada. Plaintiffs *Milka Yimam* resides in Kenya. Plaintiff *Helena Yonatan Zerihun* resides in Saudi Arabia and *Zerihun Hailemariam* resides in Ethiopia.

3. 157 people died in this air crash.

4. Defendant *The Boeing Company* is present, doing substantial business, and maintains its headquarters within the Northern District of Illinois, specifically including Cook County.

5. The Court has subject matter jurisdiction and personal jurisdiction pursuant to *Multiparty, multiforum jurisdiction,* 28 U.S.C. §1369, *Federal question,* 28 U.S.C. §1331, and/or Diversity of citizenship, 28 U.S.C. §1332.

6. Venue is proper under *Venue generally,* 28 U.S.C. §1391.

## III. PARTIES

7. Plaintiff *Olumuyiwa Balogun* is the widow of Decedent *Adebola Pius Adesanmi*, natural mother and guardian of their minor daughter O.A.A. and Personal Representative of her Decedent's Estate.

8. Plaintiff *Milka Yimam* is the mother of Decedent *Sidrack Getachew* and the Personal Representative of his Decedent's Estate. *Helena Yonatan Zerihun* is the sister of the Decedent and court appointed guardian of her and the Decedent's father *Zerihun Hailemariam*.

2

9.     Defendant *The Boeing Company* (Boeing) is a corporation organized under the laws of the State of Delaware and present and doing business within the Northern District of Illinois.

## IV. SYNOPSIS

10.     Driven by stiff competition, Boeing jerry-built a modified version of its 737 series designated as the 737-8 MAX. Repositioning of larger, more powerful engines created a structural defect that destabilized the aircraft causing a dangerous upward pitch risking a catastrophic stall.

11.     Boeing attempted to fix this structural defect by creating a new computer program, the Maneuvering Characteristics Augmentation System (MCAS) This program was designed to force the nose of the plane downwards whenever data from a single angle of attack (AoA) sensor indicated the plane was approaching a stall. Once the aircraft was flight tested, Boeing tried to fix MCAS by increasing its power to alter pitch downwards by more than fourfold. Without pilot counteraction, MCAS would drive the plane's nose downwards by 40° in less than 25 seconds.

12.     Other modifications were defectively designed. Pilot movement of the control column would no longer restore manual control of the airplane to the pilots. When MCAS was activated, CUTOUT switches no longer allowed pilots to retain use of the electric motor controlling the stabilizers. The AoA disagree light was no longer standard as it had been. It had to be purchased as an option. To further keep costs low, Boeing's pilot training program consisted of a woefully inadequate 56-minute iPad program.

13.     Boeing crossed the line between simple negligence when it concealed the dangers created by these defects in design, first from the FAA in the certification process, then in advertising to its airline customers, and worst of all, in failing to properly train and inform pilots.

14.     While the 737-8 MAX was a huge marketing success for Boeing—their greatest ever. However, these design defects combined with Boeing's other negligence and its willful and wanton misrepresentations and concealment ultimately caused the death of 346 humans in two separate crashes, first in Indonesia on October 29, 2018 and then in this subject accident on March 10, 2019 in Ethiopia in which plaintiffs' loved ones were among the decedents.

## V. FACTS

15.     Desperate to compete with the newly developed Airbus A320neo, Defendant Boeing hastened to jerry-build a modified edition its 50-year-old model 737 series. In June of 2012, Boeing applied to the FAA to amend its 737 certificate to include a new model 737-8 MAX. Boeing represented that no modifications from previous 737 models required a new certificate.

16.     Boeing outfitted the new model with CFM LEAP 1-B engines; so large they could not fit under the wings without the danger of scraping on the runway while landing. To prevent this, Boeing made a fatal decision to install these new engines approximately 12" forward and 12" upward and installing a longer nose gear strut to accommodate these bigger engines. This altered the center of gravity and destabilized

4

the basic aircraft longitudinally. The nose developed a tendency to pitch upward exposing the plane to a dangerous risk of stalling.

17.     Pitch, the horizontal angle of the plane, can be controlled in several ways. Primarily by adjusting the horizontal stabilizers, which can be accomplished by two means—either by a single electric motor or mechanical cables both of which physically control the angle of the stabilizers.

18.     The electric motor is controlled by three methods: autopilot when engaged; MCAS when triggered; and manually by the pilots using the electric stabilizer trim switches located on the yokes. whenever the autopilot is engaged or when MCAS is triggered by data derived from a single AoA sensor indicating pitch is too high, risking a stall. The cables run to a manual pitch trim wheel.

19.     Finally, manual movement of the elevator control columns by the pilots hydraulically adjusts smaller elevators to fine tune the pitch.



MAX Cockpit Trim Controls:

1. ELECTRIC TRIM SWITCHES
2. ELEVATOR CONTROL COLUMNS
3. MANUAL PITCH TRIM WHEELS
4. CUTOUT SWITCHES

20.     In an attempt to fix the destabilization created by this structural defect, Boeing created a new software program—MCAS—for the flight control computer. When one of the plane's Angle of Attack (AoA) sensors indicated the plane's nose was

approaching an angle creating a risk of a stall, MCAS automatically kicks in, utilizing the stabilizers to force the plane's nose downward. The original MCAS was programmed to move the stabilizers .6°, which on an 8 to 1 ratio would alter the plane's pitch downward by 4.8°.

21.    However, when tested in real flight, Boeing's engineers were shocked to find this adjustment grossly inadequate. They increased the stabilizers' movement by over four times the original adjustment, which would alter the plane's pitch downward by 20° on each MCAS application. To make matters worse, MCAS repeated the process every 15 seconds. Thus, without swift pilot counteraction, MCAS would alter the plane's angle of attack to the maximum 40° downward in less than 25 seconds.

22.    Boeing made several other particularly significant modifications to the standard features on previous 737 models.

23.    First, MCAS was defectively designed to give no warning it had been activated. Pilots would have to figure it out on their own by observing the action of the plane.

24.    Second, pulling or pushing on the columns had always been the means to reclaim complete manual control by the pilots. Not so on this new 737-8 MAX. To the contrary, the MCAS was programmed to push the columns forward to enlist the assistance of the elevators in moving the nose downward. Strong pilots using all their strength might overcome the pressure applied by MCAS, but they could not hold it

for long. Worse, contrary to pilots' experience on previous models, it would not return control of the stabilizers to the pilots.

25.     Third, the two CUTOUT switches. On previous models the right-hand switch deactivated the autopilot leaving the buttons on the yokes in control of the electric motor that raises or lowers the stabilizers. Thus, pilots remained in complete control of the electric motor powering stabilizer adjustment.

26.     That previous CUTOUT configuration ended abruptly on the 737 MAX. Labeled on the left "PRI" for primary and on the right "B/U" for back up, both switches did the same thing—interrupted power to the electric motor. Neither switch left the pilots the capability to turn MCAS off while retaining use of the electric stabilizer trim switches with the electric motor still functioning.

27.     Regardless of which switch the pilots flipped, the electric motor no longer had power. And, unlike the previous setup, pilots lost the crucial ability to use the electric stabilizer trim switches to employ the power of the electric motor to adjust the stabilizers. Flipping either CUTOUT switch would deactivate the motor, leaving the pilots with only the manual pitch trim wheels to raise or lower the stabilizers manually via cables.

28.     Fourth, the 737 MAX retained two AoA sensors to guard against damage or other failures of a single sensor. However, unbeknownst to Ethiopian Airlines and their pilots, the previously standard "AoA Disagree" warning light was no longer standard. The airlines had to purchase the optional AoA Indicators on the Primary Flight Display (PFD).

7

29.     Failure of an AoA sensor is reasonably foreseeable. AoA sensors are known to fail for a variety of reasons, often because of physical damage such as a bird-strike. Nonetheless, Boeing did not engage in, nor did the FAA require any, flight testing of MCAS failure for any reason including a failure because of receiving erroneous data from a malfunctioning AoA sensor.

30.     Boeing offered only a woefully inadequate 56-minute iPad program, which included no mention of MCAS. No flight simulator training or testing was offered.

31.     However, Boeing's egregious misconduct did not end there. Boeing crossed the line between negligence and intentional misconduct when it concealed these dangerous defects in design, first from the FAA in the certification process, then from the airlines in its advertising and promotions as well as its manuals, and worst of all, in failing to properly train and inform pilots. Pilots were not even aware of MCAS' existence.

32.     As part of the certification process of the new 737 MAX, Boeing informed the FAA that the MCAS adjustment was .6°. Until after the crash of Lion Air flight JT610 on October 29, 2018, Boeing willfully and wantonly failed to:

    a. Inform the FAA of the increase in the power of MCAS to alter the plane's pitch downwards by 40° in less than 25 seconds;

    b. Inform the airlines or the pilots of even the existence of the MCAS program;

    c.  Warn that MCAS gave no warning when it activated. Pilots would have to detect that by observing its effects on the movement of the plane's pitch;

    d.  Warn that when MCAS was activated, moving the columns would no longer restore manual control of the aircraft to the pilots;

    e.  Warn that flipping either of the CUTOUT switches would cut power to the electric motor used to adjust the stabilizers rendering the electric stabilizer trim switches on the yokes useless; and,

    f.  Inform the airlines or their pilots that the "AoA Disagree" light no longer functioned without the purchase of the optional AoA Indicators;

33.    Boeing also strove to minimize the need for expensive training. Boeing advertises on its website: *"Because of the 737's popularity with airlines everywhere around the world, integrating the new 737 MAX is an easy proposition. As you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737 …"*

34.    Flight simulator training was not required or advised. In fact, none was even created.

35.    While the 737-8 MAX was a huge marketing success for Boeing—the greatest ever, these designed defects combined with Boeing's willful and wanton concealment ultimately caused the death of 346 humans in two separate crashes, first in Indonesia on October 29, 2018 and then in this subject accident on March 10, 2019 in Ethiopia in which plaintiffs' loved ones were among the decedents.

36.     As a result of the first accident in Indonesia, on November 7, 2018 the FAA ordered Boeing to notify all its 737-8 MAX customers to revise "certificate limitations and operating procedures of the airplane flight manual (AFM) to provide trim procedures to follow under certain conditions." The FAA's Emergency Airworthiness Directive (AD) 2018-23-51 stated:

> This emergency AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain.

37.     To comply with the FAA order, Boeing sent out a Flight Crew Operations Manual Bulletin numbered TBC-19. However, it failed to advise pilots that:

a.  MCAS gave no warning when it was activated;

b.  Pilots had lost the ability to reclaim manual control of the plane by moving the control column;

c.  When either CUTOUT switch was flipped, the electric stabilizer switches on the yoke were rendered useless because power to the electric motor was no longer present;

d.  The AoA disagree light was no longer functional unless that option had been purchased and,

e.  Boeing's bulletin did not even mention expressly MCAS. Pilots were still not advised of its existence.

38.     At nearly the same time Boeing delivered this second ill-fated 737-8 MAX registered ET-AVJ to Ethiopian Airlines.

39.     On March 10, 2019, this plane departed Addis Abba, Ethiopia on Ethiopian Airlines scheduled international flight ET 302 for Nairobi, Kenya at 5:38 UTC with 8 crew and 149 passengers onboard.

40.     Preliminary analysis of the DFDR, CVR, and ATC communications indicated that shortly after takeoff the two (2) AoA's deviated from each other. The right read a maximum value of 15.3°, while the left erroneously indicated a maximum of 74.5°. Tragically, MCAS was reading the faulty values from the left AoA sensor.

41.     Based on the erroneous data from the failed AoA sensor, MCAS activated, driving the plane's nose downward. Thus, began a tug-a-war battle between the pilots and MCAS. The pilots tried to keep the plane climbing through the electric stabilizer trim switches on the yokes. To overcome MCAS created resistance, they also both simultaneously pulled on the control columns to enlist the elevators in their efforts to climb. However, they discovered that 5 seconds later, MCAS would reactivate to once again execute an un-commanded aircraft nose down.

42.     Following the Runaway Stabilizer procedures Boeing had previously provided, the pilots flipped the CUTOUT switches to the out position only to discover, to their surprise, that the electric stabilizer switches on the yokes had become non-operational. All power to the electric motor controlling the stabilizers has stopped.

43.     Their last resort was the manual pitch trim wheels attached to the stabilizers by cables. They could not force the wheel to reverse the positions of the stabilizers, apparently because of aerodynamic forces loaded on the jackscrew.

44.     The pilots then turned the CUTOUT switches back on in an attempt to utilize the power of the electric motor to relieve the tension on the jackscrew before flipping the CUTOUT switches to their out positions to regain control of the stabilizers. This futile tug-a-war battle is readily revealed in this chart of FDR data published in the preliminary report of the Ethiopian Aircraft Accident Investigation Bureau (AIB). All the pilot's efforts proved futile.

45.     All onboard were subject to 5-6 minutes of horrifying phugoid motion, culminating in terror as the plane would take its final dive, impacting the terrain below at over 500 mph. All onboard were killed.



## VI. FIRST CAUSE OF ACTION
## (Strict Product Liability)

46.     All paragraphs above are incorporated herein by reference.

47.     When Boeing delivered the subject airplane to Ethiopian Airlines in early November of 2018, Boeing knew that Ethiopian Airlines was relying on Boeing's skill and/or judgment to furnish a plane fit for its intended purpose, that it was

reasonably safe, without dangerous defects, and that adequate warnings and instructions were being provided.

48. However, the plane was not reasonably safe because components were defectively manufactured, features were defectively designed, and/or Boeing failed to adequately warn and/or instruct the airlines and their pilots. Nor did the plane conform to Boeing's express warranties or implied warranties as mandated by law. Boeing's multiple failures to comply with these legal requirements were a proximate cause of all damages suffered by the plaintiffs and their Decedents.

49. Boeing is strictly liable to plaintiffs for all damages allowable under law.

## VII. SECOND CAUSE OF ACTION
### (Negligent Product Liability)

50. All paragraphs above are incorporated herein by reference.

51. The aircraft was not reasonably safe when delivered. Boeing delivered it with defective equipment and/or programming in the flight control system as described herein above.

52. The aircraft was likewise rendered unsafe because it contained several design defects as described herein above. Boeing could have designed and manufactured additional redundant and fail-safe systems that were practical and feasible at a cost outweighed by the deadly serious risk of harm.

53. The aircraft was likewise rendered unsafe because Boeing did not provide adequate warnings and instructions concerning how to respond to an MCAS failure in the flight control system such as occurred in this accident when the left AoA sensor failed.

13

54.    Boeing was negligent because it failed to act in the manner of a reasonably prudent aircraft manufacturer, to appreciate the dangers, install non-defective equipment, correct design defects, and to issue adequate warnings and instructions.

55.    That MCAS could be erroneously activated by false data received from a single AoA sensor, with no warning that it disagreed with the other sensor, violated a core principle of aircraft design that air disasters such as occurred here cannot depend upon a single point of failure.

56.    Beyond common law, Boeing's misconduct was also a violation of the aviation Code of Federal Regulations:

a. 14 CFR §25.203 STALL CHARACTERISTICS.
(a) It must be possible to produce and to correct roll and yaw by unreversed use of the aileron and rudder controls, up to the time the airplane is stalled. **No abnormal nose-up pitching may occur.** The longitudinal control force must be positive up to and throughout the stall. In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of controls. [Emphasis added]
…
b. 14 CFR §25.671 GENERAL CONTROL SYSTEM REQUIREMENTS
…
(c) The airplane must be shown by analysis, tests, or both, to be capable of continued safe flight and landing after any of the following failures in the flight control system and surfaces (including trim, lift, drag, and feel systems), within the normal flight envelope, **without requiring exceptional piloting skill or strength.** [Emphasis added]
c. 14 CFR §25.672 Stability augmentation and automatic and power operated systems
If the functioning of stability augmentation or other automatic or power-operated systems is necessary to show compliance with the flight characteristics requirements of this part, such systems must comply with §25.671 and the following:
(a) A **warning** which is clearly distinguishable to the **pilot** under expected flight conditions without requiring his attention must be provided for any **failure in the stability** augmentation system or in

14

any other automatic or power-operated system **which could result in an unsafe condition if the pilot were not aware of the failure.** Warning systems must not activate the control systems.

(b) The design of the stability augmentation system or of any other automatic or power-operated system must permit initial counteraction of failures of the type specified in §25.671(c) **without requiring exceptional pilot skill or strength,** by either the deactivation of the system, or a failed portion thereof, or by overriding the failure by movement of the flight controls in the normal sense. [Emphasis added]

57.     Such negligence was a proximate cause of wrongful deaths of plaintiffs' Decedents. Therefore, Boeing's negligence renders it liable for all damages allowable under laws.

## VIII. THIRD CAUSE OF ACTION
## (Pre-Death Fright & Terror)

58.     All paragraphs above are incorporated herein by reference.

59.     The strict liability and negligence alleged in the previous causes of action were additionally proximate causes of personal injuries to Decedents by way of horrific Pre-Death Fright & Terror they experienced before impact with the terrain.

60.     The oscillating movement of the plane at high speeds as it alternatively climbed and then descended subjected Decedents' bodies to painful negative and then positive Gs as their emotions swung from hope as the plane climbed and terror as it descended. The final dive into the ground at roughly 500mph was horrifying beyond imagination.

61.     Boeing is liable for the Pre-Death Fright & Terror each Decedent suffered because of the defendants' wrongful conduct as described herein.

## IX.  FOURTH CAUSE OF ACTION
### (Loss of Consortium)

62.     All paragraphs above are incorporated herein by reference.

63.     The strict liability and negligence alleged in the previous causes of action were additionally proximate causes of Loss of Consortium experienced by all spouses and parents of their respective Decedents.

64.     Boeing is liable for the Loss of Consortium each plaintiff has suffered as the result of the defendants' wrongful conduct.

## X. FIFTH CAUSE OF ACTION
### (Willful and Wanton Misconduct)

65.     All paragraphs above are incorporated herein by reference.

66.     The evidence is clear and convincing that well before this accident Boeing was on actual notice that the airplane had a defectively designed flight control system. It is equally obvious that Boeing knew the dangers involved before this accident.

67.     Despite their awareness of the potentially dangerous consequences, Boeing's officers and/or managing agents deliberately sold the aircraft knowing it had dangerous defects in design. They further failed to provide sufficient warnings, and/or instruction and training.

68.     They also intentionally concealed that destabilization caused by repositioning of larger engines required a huge increase in movement of the horizontal stabilizers. Boeing left the calibrated degree that the plane's pitch would be altered at 4.8°, when in truth they had increased it to 20°. Boeing's System Safety

Analysis (SSA) also failed to advise the FAA that MCAS would continue to reset itself, repeatedly forcing the nose of the plane downwards.

69.     Said conduct was despicable.  Boeing's tortious conduct evinces a high degree of moral culpability, committed with fraud, actual malice, in that its agents acted willfully, and/or with such gross negligence as to indicate a wanton disregard of the safety of others.

70.     Plaintiffs may to recover beyond compensatory damages; they are entitled to punitive damages against Boeing.

## XI. RESERVATION OF RIGHT TO ADD FAA AS DEFENDANT

71.     The United States Federal Aviation Administration (FAA) bears a share of the culpability for this accident by its conduct in certifying Boeing's AFM and FCOM on this 737 MAX without requiring sufficient testing and data on relevant safety issues.

72.     To facilitate Boeing market pressures, superiors within the FAA pressured subordinates to delegate evermore of its regulatory authority to Boeing agents.

73.     In a detailed Office of Inspector General report dated June 22, 2012, the Director of Special Investigations, Ronald C. Engler, stated in his cover letter:

> The OIG's Complaint Analysis Center received a referral from our Aviation and Special Programs Audit office regarding the negative atmosphere at the FAA Transport Airplane Directorate (TAD) and its **potential impact on the oversight of Boeing aircraft certification**. Our investigation substantiated employee allegations that TAD and FAA headquarters **managers have not always supported TAD employee efforts to hold Boeing accountable** and this has created a negative atmosphere within the TAD.

Of particular note, our interviews of 15 employees found that 9 **feared retaliation and 7 requested confidentiality** (including some who requested to be interviewed off site) because of a fear of retaliation. Given the potential implications to national FAA policies and aviation safety, our Report of Investigation is attached for your review and any action deemed appropriate. If you would like additional details on our investigation, we would be pleased to provide an oral briefing. [Emphasis added]

74.     The FAA failed to require Boeing to provide adequate warnings and instruction on the newly created MCAS. It wrongfully approved obviously inadequate training and lack of instruction in manuals.

75.     The FAA failed to follow its own mandatory rules and protocols even after having been expressly alerted to the dangers by their subordinates and equivalent governmental authorities in Canada, European Union, and Brazil.

76.     It was only after the first tragic crash of Lion Air flight JT610 that the FAA ordered Boeing to correct the deficiencies in the warnings and instructions in Boeing's manuals. Ten days post-accident, the FAA finally fulfilled its duty issuing an Emergency Airworthiness Directive (AD) ordering Boeing to correct its omissions:

**Background**

This emergency AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single AoA sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain.

**FAA's Determination**

We are issuing this AD because we evaluated all the relevant information and determined the unsafe condition described previously is likely to exist or develop in other products of the same type design. Due to the need to correct an urgent safety of flight situation, good cause exists to make this AD effective in less than 30 days.

77. The AD ordered Boeing to modify its manual on the 737 MAX to include the specific warnings and instructions on procedures to respond to an erroneously triggered MCAS. Had agents of the FAA adhered to their mandatory duties and their own protocols in the certification process, these obvious unsafe conditions that caused this tragic accident should have been addressed.

78. Tragically, agents of the FAA effectively entered into a civil conspiracy with agents of Boeing to rush through the certification process heedless of proper safety precautions. Correct FAA action came all too late for the 157 victims killed in this accident.

79. However, plaintiffs must first exhaust administrative remedies under the Federal Tort Claims Act 28 U.S.C. § 1346 (FTCA) by filing claims with the U.S. Government. These plaintiffs are filing said claims.

80. Accordingly, plaintiffs request the right to amend this complaint to include the FAA once the FTCA claims process has been completed.

## XII. DAMAGES

81. As a proximate result of defendant Boeing's wrongful conduct, Plaintiffs have suffered both special and general damages:

    **a.** Plaintiffs have suffered loss of net accumulations in Decedent's estate, loss of support, loss of services, and other pecuniary damages.

    b. Plaintiffs have suffered loss of love, comfort, care, companionship, guidance, society and all other forms of consortium. They have experienced grief, sorrow, and mental anguish to the extreme.

19

    **c.** Plaintiffs are entitled to recover damages for Decedents' predeath fright and terror.

82. Said damages have been sustained and will continue in the future.

83. The nature and extent of Plaintiffs' damages will be proven at trial.

## XIII. PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs pray for judgment against the defendants awarding plaintiffs:

    a. Economic damages

    b. Non-economic general damages;

    c. Punitive damages;

    d. Pre-judgment and post-judgment interest;

    e. Actual attorneys' fees and costs incurred; and,

    f. Such other relief as the Court deems just and equitable.

## XIV. DEMAND FOR JURY TRIAL

84. Plaintiffs demand trial by jury on all issues

Dated this 30th day of July 2019.

Lead Trial Counsel:

***HERRMANN LAW GROUP***
Attorneys for Plaintiffs

*/S/ CHARLES HERRMANN*
_____

CHARLES HERRMANN (WA Bar #6173)
Pending admission *Pro Hac Vice*
505 5th Ave South, Ste. 330
Seattle, WA 98104
Email: charles@hlg.lawyer
Voice: (206) 625-9104
Fax:   (206) 682-6710

**HERRMANN LAW GROUP**

/s/ LARA HERRMANN
_____

LARA HERRMANN (WA Bar #30564)
Pending admission *Pro Hac Vice*
505 5th Ave South, Ste. 330 Seattle,
WA 98104
Email: lara@hlg.lawyer
Voice: (206) 625-9104
Fax:   (206) 682-6710


**HERRMANN LAW GROUP**

/s/ ANTHONY MARSH
_____

ANTHONY MARSH (WA Bar #45194)
Pending admission *Pro Hac Vice*
505 5th Ave South, Ste. 330 Seattle,
WA 98104
Email: anthony@hlg.lawyer
Voice: (206) 625-9104
Fax:   (206) 682-6710


**HERRMANN LAW GROUP**

/s/ RICHARD E. BROWN
_____

RICHARD E, BROWN (CA Bar #104253)
Pending admission *Pro Hac Vice*

505 5th Ave South, Ste. 330
Seattle, WA 98104
Email: richard@hlg.lawyer
Voice: (510) 367-0604
Fax:   (925) 891-0333

**HERRMANN LAW GROUP**

/s/ *MARK E. LINDQUIST*
_____

MARK E. LINDQUIST (WA Bar #25076)
Pending admission *Pro Hac Vice*
505 5th Ave South, Ste. 330
Seattle, WA 98104
Email: mark@hlg.lawyer
Voice: (206) 625-9104
Fax:   (206) 682-6710

**HERRMANN LAW GROUP**

/s/ *CRYSTAL LLOYD*
_____

CRYSTAL LLOYD (WA Bar #46072)
Pending admission *Pro Hac Vice*
1535 Tacoma Ave South
Tacoma, WA 98403
Email: crystal@hlg.lawyer
Voice: (253) 627-8142
Fax:   (253) 627-1835

**CARMEN D. CARUSO LAW FIRM**

/s/ *CARMEN D. CARUSO*
_____

Carmen D. Caruso (# 6189462)
**CARMEN D. CARUSO LAW FIRM**
77 West Washington Street, Ste. 1900
Chicago, IL 60602
Email: cdc@cdcaruso.com
Voice: (312) 626-1160
Fax:   (312) 276-8646